**UNITED STATES of America,**
**Plaintiff–Appellant,**

v.

**Michael Eugene HILLYER,**
**Defendant–Appellee.**

No. 05–4295.

United States Court of Appeals,
Fourth Circuit.

Argued: May 26, 2006.

Decided: Aug. 1, 2006.

**ARGUED:** Anne Margaret Hayes, Assistant United States Attorney, Office of the United States Attorney, Raleigh, North Carolina, for Appellant. J. Matthew Martin, Asheville, North Carolina, for Appellee. **ON BRIEF:** Frank D. Whitney, United States Attorney, Banumathi Rangarajan, Assistant United States Attorney, Office of the United States Attorney, Raleigh, North Carolina; Todd S. Aagaard, John E. Arbab, United States Department of Justice, Environmental and Natural Resources Division, Washington, D.C.; Carol Ann Siciliano, Assistant General, United States Environmental Protection Agency, Washington, D.C., for Appellant. Thomas C. Manning, Manning & Crouch, Raleigh, North Carolina, for Appellee.

Before MICHAEL and KING, Circuit Judges, and JOSEPH F. ANDERSON, JR., Chief United States District Judge for the District of South Carolina, sitting by designation.

Vacated and remanded by published opinion. Judge MICHAEL wrote the opinion, in which Judge KING and Chief Judge ANDERSON joined.

## OPINION

MICHAEL, Circuit Judge:

Michael Eugene Hillyer pled guilty to two federal environmental crimes involving illegal dredging in North Carolina's Croatan Sound. The government appeals Hillyer's sentence of three years' probation, contending that the district court erred both in calculating the advisory guideline range and in imposing a non-guideline (or variance) sentence. We conclude that the guideline range was improperly calculated because the departure granted under U.S.S.G. § 5K2.20 for aberrant behavior was unwarranted. We therefore vacate the sentence and remand for resentencing.

I.

A.

We recount the facts as established by the guilty plea and presented without objection in the presentence report and at the sentencing hearing. In March 1998 the U.S. Army Corps of Engineers (the Corps) granted a permit to the North Carolina Department of Transportation (DOT) to build a 5.25 mile bridge across the Croatan Sound from Manns Harbor to Manteo. The bridge would be named the Virginia Dare Memorial Bridge. In April 1998 DOT awarded a $100 million construction contract to Balfour Beatty Construction, Inc. (Balfour). The contract required Balfour to comply with the Corps permit, which was issued under the Rivers and Harbors Act of 1899, 33 U.S.C. §§ 401 *et seq.,* and the Clean Water Act, 33 U.S.C. §§ 1251 *et seq.* Construction began in 1998, but by mid–2000 the project was over budget and far behind schedule. Moreover, the project had an "abysmal safety record." J.A. 51. In June 2000 Balfour, in an effort to salvage the job, brought in Hillyer as project manager. Hillyer had supervised some of the largest and most complicated bridge projects in the country. He had earned a reputation for competence and for being a hardnosed and sometimes bullheaded manager who

demanded quality work from his employees. As the project's new manager, Hillyer assumed responsibility for Balfour's compliance with all applicable permits and the federal environmental laws that they incorporated.

The original permit from the Corps prohibited the excavation of material from, and the fill or disposal of material within, the affected waters and wetlands, except as authorized by the permit or any modification. In 1998 at Balfour's request, DOT obtained a permit modification to allow construction of a temporary load-out trestle (or bridge) to be built on pilings driven into the bottom of the Croatan Sound. The permit authorized Balfour to hammer-drive the pilings into the bottom of the sound; it did not authorize prop washing or jetting, techniques used to dredge and displace material from the bottom of a water course. ("Dredged soil" is a pollutant under the Clean Water Act, 33 U.S.C. § 1362(6).) The trestle, completed in the fall of 1998, extended 700 feet into the water and was 60 feet wide. It facilitated the transport of construction materials from the shoreline to barges out in the water.

The Virginia Dare Memorial Bridge opened August 9, 2002, on schedule. Hillyer had completely rehabilitated the project, reducing costs, ensuring a timely finish, and garnering an award for "the safest project on the East Coast." J.A. 45. The positive run of events began to turn, however, the day before the bridge opened. On August 8, 2002, Hillyer directed his employees to dump fill material from the project into wetlands at a nearby marina site, in violation of the permit and applicable federal laws. DOT requested that Balfour cease dumping material at the marina site, but the company refused. A Corps representative for regulatory matters then met with Hillyer to advise him

that depositing fill material was impermissible and would require permit modification. He further instructed Hillyer on how to contact the Corps directly for "guidance and authorization on regulatory compliance matters." J.A. 132. Hillyer, however, "responded with profanity and essentially told the [Corps representative] that it was his (Hillyer's) fill and he (Hillyer) would do what he (Hillyer) wanted." *Id.*

After the bridge opened, Balfour began efforts to remove the trestle so that it could be transported and reassembled at another bridge project, where it was urgently needed. Balfour tried using a crane to extract the trestle pilings, but sediment around the pilings blocked the crane from getting close enough for the extraction. In late October 2002 Hillyer directed his employees to excavate a channel around the trestle to facilitate crane access. Hillyer first instructed the employees to use a clam bucket, but was promptly notified by DOT that this activity constituted dredging and was impermissible under existing permits. On October 22, 2002, Hillyer directed employees to use another dredging technique, specifically prop dredging or prop washing with tugboat propellers, to displace material from the sound bottom. The following day, upon discovering the prop dredging, DOT faxed Hillyer a letter notifying him once again that he was violating existing permits and must cease all dredging unless and until a permit modification was obtained. In response, Hillyer sent DOT a request that it seek permit modification from the Corps.

Without waiting for the necessary modification, Hillyer ordered more prop dredging. He assembled the workers at 6 p.m. on Sunday, October 27, at a nearby marina and arranged for them to be shuttled by boat to the site, where they resumed the

prop dredging. He ordered his crew to shut down the dredging operation early the next two days, around 3 or 4 p.m., only to return at night and resume the work under cover of darkness, with the tugboat's navigation lights turned off. Hillyer took these unusual steps in an obvious attempt to conceal the unpermitted activity from DOT. The concealment effort failed, however. A Balfour employee on board the tugboat the night of October 29 called Hillyer to report that "DOT was watching" and videotaping the activity. J.A. 133. Hillyer, who was under considerable pressure from Balfour to remove the trestle as quickly as possible, became irate and instructed the crew to continue the prop dredging.

The dredging continued until October 31, 2002, when removal of the trestle was completed. DOT thereafter sent three letters to Balfour notifying it that the prop dredging was a permit violation. In late December 2002 the Corps issued a notice of violation against Balfour for the unauthorized dredging. In January 2003, at DOT's request, Balfour removed Hillyer from all bridge projects (and eventually fired him) because of his "inability to follow the reasonable direction of the DOT's resident engineers" and his violation of the permit and applicable environmental laws. J.A. 133. DOT determined that the unauthorized dredging displaced roughly 5,500 cubic yards (about 500 dump truck loads) of sound bottom and disturbed 8.2 acres of shallow water habitat designated as "high quality." J.A. 133. To mitigate the damage and facilitate restoration, DOT deposited several tons of " 'oyster clutch' material" at the dredge site. J.A. 134.

## B.

Balfour pled guilty in May 2004 to a two-count criminal information charging violations of the Rivers and Harbors Act of 1899 and the Clean Water Act. The company was sentenced to a $400,000 fine and five years' probation, which included a condition that its project managers attend annual training on regulatory compliance. As required by the plea agreement, Balfour also paid DOT's mitigation costs in full, totaling about $36,000. In April and May 2004 two Balfour employees who had worked under Hillyer during the prop dredging pled guilty to criminal informations charging violations of these same statutes. The two were sentenced to probation and hours of community service.

Hillyer, for his part, pled guilty in October 2004 to two counts of a four-count indictment: conspiring to violate the Rivers and Harbors Act of 1899 and the Clean Water Act, see 18 U.S.C. § 371 (Count One); and violating the Rivers and Harbors Act of 1899 and aiding and abetting the violation, see 33 U.S.C. §§ 403, 406, and 18 U.S.C. § 2 (Count Two). Before downward adjustments, Hillyer's offense level was 20, which included a six-level increase for "ongoing, continuous, and repetitive discharge and release of a pollutant." J.A. 139; see U.S.S.G. § 2Q1.3(b)(1)(A). The government moved for (1) a three-level downward adjustment for acceptance of responsibility, U.S.S.G. § 3E1.1; (2) two separate two-level downward departures based on the lack of permanent environmental harm and the lack of public health risk, U.S.S.G. § 2Q1.3, comment. (nn.4, 7); and (3) a two-level upward adjustment for obstruction of justice, U.S.S.G. § 3C1.1. The court expressly granted the first request and expressly rejected the last; it did not rule on the second request, but implicitly granted it by lowering Hillyer's offense level to 13. Hillyer moved, over the government's objection, for a downward departure under U.S.S.G. § 5K2.20 on the ground that his conduct constituted aberrant behavior.

The court did not expressly rule on the § 5K2.20 motion at the sentencing hearing.

Without any departure for aberrant behavior, Hillyer's offense level was 13. This level, combined with a criminal history category of I, would yield a guideline range of 12 to 18 months' imprisonment. At the hearing the district court announced that it was sentencing Hillyer to three years' probation, 300 hours of community service, and a $10,000 fine. The court did not state its reasons for imposing probation, but indicated that a written order would follow.

Two written orders followed, the second in response to Hillyer's Rule 36 motion to correct the judgment. *See* Fed.R.Crim.P. 36. In ruling on the motion, the district court clarified that it had granted a three-level downward departure for acceptance of responsibility and two two-level downward departures based on the lack of harm, yielding an offense level of 13 and an advisory range of 12 to 18 months' imprisonment. The court then stated that it was granting Hillyer's motion for a downward departure under § 5K2.20 for aberrant behavior, but failed to specify the extent of this departure or the resulting guideline range. In explaining the § 5K2.20 departure, the court stated that Hillyer had "engaged in a single criminal transaction that did not involve significant planning and was of limited duration." S.J.A. 151. The court also concluded that Hillyer's conduct was inconsistent with his "long record of being attentive to environmental and safety concerns," S.J.A. 151, and therefore represented "a marked deviation ... from [his] otherwise law-abiding life," U.S.S.G. § 5K2.20(b). The other factors that the court considered in granting the § 5K2.20 departure were Hillyer's age (66 at the time), the recent payment by his employer (Balfour) of "substantial restitu-

tion," and the lack of permanent harm to the environment or to human health. S.J.A. 151. Finally, without identifying a guideline range recalibrated to include the § 5K2.20 departure, the court stated that it had considered the factors in 18 U.S.C. § 3553(a) and had determined that "[a] guideline sentence ... is inadequate," S.J.A. 152, or "unduly harsh," J.A. 122. Accordingly, the court reimposed the original non-guideline sentence of three years' probation. The government appeals.

## II.

We have previously outlined the steps a district court must take in arriving at a sentence after *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005):

> First, the court must correctly determine, after making appropriate findings of fact, the applicable guideline range. Next, the court must determine whether a sentence within that range serves the factors set forth in [18 U.S.C.] § 3553(a) and, if not, select a sentence within statutory limits that does serve those factors. In doing so, the district court should first look to whether a departure is appropriate based on the Guidelines Manual or relevant case law.... If an appropriate basis for departure exists, the district court may depart. If the resulting departure range still does not serve the factors set forth in § 3553(a), the court may then elect to impose a non-guideline sentence (a "variance sentence"). The district court must articulate the reasons for the sentence imposed, particularly explaining any departure or variance from the guideline range.

*United States v. Moreland*, 437 F.3d 424, 432 (4th Cir.2006) (alterations, internal quotation marks, and citations omitted).

■ "Our task in reviewing a post-*Booker* federal sentence is to determine whether the sentence is within the statutorily prescribed range and is reasonable." *Id.* at 433 (internal quotation marks and citation omitted). If, for example, a "sentence is based on an error in construing or applying the Guidelines, it will be found unreasonable and vacated." *United States v. Green,* 436 F.3d 449, 457 (4th Cir.2006); *see also* 18 U.S.C. § 3742(f)(1). The government argues that the district court misconstrued or misapplied guideline § 5K2.20 when it granted Hillyer a downward departure for aberrant behavior. We agree.

■ A defendant may be eligible for a § 5K2.20 departure if he "committed a single criminal occurrence or single criminal transaction that (1) was committed without significant planning; (2) was of limited duration; and (3) represents a marked deviation by the defendant from an otherwise law-abiding life." U.S.S.G. § 5K2.20(b). Because the guidelines routinely take into account a defendant's criminal history, "aberrant behavior must 'mean[ ] something more than merely a first offense.' " *United States v. DeBeir,* 186 F.3d 561, 573 (4th Cir.1999) (citing *United States v. Glick,* 946 F.2d 335, 338 (4th Cir.1991)). A single occurrence or transaction of aberrant behavior suggests a "spontaneous and seemingly thoughtless act[ion]." *Glick,* 946 F.2d at 338 (internal quotation marks and citation omitted); *see United States v. Bueno,* 443 F.3d 1017, 1023 (8th Cir.2006).

■ Hillyer gets nowhere under § 5K2.20 because he cannot satisfy the guideline's threshold requirement of a "single criminal occurrence or single criminal transaction." U.S.S.G. § 5K2.20(b); *see Glick,* 946 F.2d at 338–39 & n. * (noting under an earlier version of the aberrant behavior guideline that "a series of

actions calculated to further criminal misconduct [cannot] be classified as aberrant behavior"). While Hillyer's conduct might have had a single motivation—to remove the temporary trestle—it was not a single occurrence or transaction. Rather, it constituted multiple criminal acts, with each occurrence of prop dredging representing a violation of the permit and applicable federal laws. *See, e.g.,* 33 U.S.C. § 1311(a). Indeed, Hillyer was assigned a six-level increase to his base offense level for "ongoing, continuous, and repetitive discharge and release of a pollutant." J.A. 139; *see* U.S.S.G. § 2Q1.3(b)(1)(A).

Moreover, Hillyer's conduct lacked at least two of the three characteristics that a single criminal occurrence must have. First, his crime was not committed without significant planning. *See* U.S.S.G. § 5K2.20(b). It instead required considerable planning—with an element of deception included—as Hillyer attempted to avoid detection and oversight by DOT. He assembled his crew off-site, at night, and on Sunday; on the following two days he pretended to close the site early, only to have his crew return at night and work under cover of darkness. Second, Hillyer's conduct was not of limited duration. It persisted for roughly ten days, from October 22, 2002, through October 31, 2002, despite repeated warnings from DOT that it was illegal and must cease. *See Bueno,* 443 F.3d at 1023 (noting that offense carried out over a number of days would not warrant a § 5K2.20 departure).

We recognize that the district court found that Hillyer has a "long record of being attentive to environmental and safety concerns." S.J.A. 151. This finding suggests that the district court believed that Hillyer satisfied the third and final § 5K2.20(b) factor, requiring that the conduct "represent[ ] a marked deviation by the defendant from an otherwise law-abid-

ing life." Even if this finding is supportable, it does not change the complexion of Hillyer's conduct during the trestle removal. The prop dredging involved multiple and repeated criminal occurrences, required significant planning, and lasted over a week. These factors establish that Hillyer's conduct does not qualify as aberrant behavior under § 5K2.20. Moreover, Hillyer's past record on environmental protection may not be as flawless as the district court believed. It appears that Hillyer engaged in at least one other environmental violation during the project, the dumping of fill material into nearby wetlands in August 2002.

In granting the § 5K2.20 downward departure, the district court also considered three factors that have no bearing on the application of that guideline section: Hillyer's age, Balfour's payment of restitution, and the lack of permanent environmental harm. Age is a discouraged departure ground to begin with. *See* U.S.S.G. § 5H1.1. More important to this discussion, Hillyer is not elderly or infirm, and his age did not turn his calculated behavior into aberrant behavior. As for the payment of restitution, the "fulfillment of restitution obligations only to the extent required by law" would be a prohibited departure ground even if Hillyer, instead of his company, had paid it. U.S.S.G. § 5K2.0(d)(5). Finally, the district court had already taken into account the lack of permanent environmental harm when it granted the government's motion for two two-level departures under § 2Q1.3, comment. (nn.4, 7). In any event, the fact that Hillyer's crimes did not result in permanent harm has no relevance to whether his behavior was "spontaneous and seemingly thoughtless," and thus aberrant. *Glick*, 946 F.2d at 338 (internal quotation marks and citation omitted).

Because Hillyer's sentence was imposed as a result of the misconstruction or misapplication of § 5K2.20 of the guidelines, we vacate the sentence as unreasonable and remand for resentencing. We do not consider the government's other argument that the sentence of probation, identified by the district court as a variance from the advisory guideline range, is unreasonable. Because the § 5K2.20 departure was of unspecified degree, we do not know from this record at what point the downward departure ended and the variance began. We therefore cannot ascertain to what extent the court intended to vary from the advisory range. For this reason, we cannot review the variance on this appeal. *See Moreland*, 437 F.3d at 433–34 (setting forth framework for reviewing a variance sentence).

On remand the district court must resentence Hillyer without granting any § 5K2.20 departure. Based on conclusive determinations from the initial sentencing, Hillyer's total offense level is 13. This offense level and Hillyer's criminal history category of I yield an advisory guideline range of 12 to 18 months' imprisonment. In arriving at a new sentence, the district court should consider whether this range "serve[s] the factors set forth in § 3553(a)." *Id.* at 432.

*VACATED AND REMANDED.*