**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 11a0161n.06

**No. 09-6390 and No. 10-5030**

**FILED**

**Mar 18, 2011**

LEONARD GREEN, Clerk

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
|    Plaintiff-Appellee | ) |
| | ) |
|        v. | )   ON APPEAL FROM THE |
| | )   UNITED STATES DISTRICT |
| CHRISTOPHER H. SHIELDS, | )   COURT FOR THE EASTERN |
| | )   DISTRICT OF KENTUCKY |
|    Defendant-Appellant. | ) |
| | ) |
| | ) |
| UNITED STATES OF AMERICA, | ) |
| | ) |
|    Plaintiff-Appellee | )   **OPINION** |
| | ) |
|        v. | ) |
| | ) |
| LAZELLE MAXWELL, | ) |
| | ) |
|    Defendant-Appellant. | ) |

**BEFORE: MOORE and WHITE, Circuit Judges, and VARLAN,* District Judge.**

     **HELENE N. WHITE, Circuit Judge.** Christopher Shields and Lazelle Maxwell each were

charged with one count of conspiracy to knowingly and intentionally distribute, and to possess with

the intent to distribute, fifty grams or more of cocaine base (crack cocaine) and one count of

conspiracy to knowingly and intentionally distribute, and to possess with the intent to distribute, 100

---

     *The Honorable Thomas A. Varlan, United States District Court for the Eastern District of
Tennessee, sitting by designation.

-1-

grams or more of heroin, in violation of 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 846. Shields pleaded guilty of the crack-cocaine offense pursuant to a plea agreement that included the dismissal of the heroin count. Maxwell pleaded not guilty and proceeded to trial. He was found guilty of both conspiracy offenses and was sentenced to 360 months' imprisonment. Shields testified at Maxwell's trial, giving testimony contradicting his earlier admissions. The district court considered this testimony at Shields's sentencing, which resulted in the court's adding two levels for obstruction of justice and denying a two-level reduction for acceptance of responsibility. Shields appeals his sentence, and Maxwell appeals his conviction and sentence, as well as the denial of his motion to suppress certain pre-trial identifications. We affirm.

## I.

This case concerns a conspiracy to sell crack cocaine and heroin in the Northern Kentucky area from approximately January to May 2008. The conspiracy became known to the police when James Pearson, who had purchased heroin from several of the alleged co-conspirators, was arrested for heroin possession on the morning of May 21, 2008. Seeking to avoid prison time, Pearson told a police officer at the scene of his arrest that he knew some men named "Stone," "Big Cuz" or "Frank," "Slim" or "Carlos," and "PJ" who lived in the Northern Kentucky area and sold crack cocaine and heroin. The police officer contacted Bill Birkenhauer, a sergeant with the Campbell County Police Department and a field supervisor for the Northern Kentucky Drug Strike Force (NKDSF), and provided Birkenhauer with Pearson's information. Birkenhauer interviewed Pearson shortly thereafter and then drove Pearson to three locations—two apartment buildings and a house—identified by Pearson as locations where the drugs were sold.

Next, Birkenhauer instructed Pearson to call "Slim," who was selling drugs at 906 Washington Avenue in Newport, Kentucky, and to go to that location to make a controlled purchase of heroin. Once Pearson made this purchase, Birkenhauer instructed him to call the individuals residing at 211 West 10th Street in Covington, Kentucky, who went by the names "Frank" and "Stone." "Frank" answered Pearson's call and told him to go to 1803 Monroe Street in Covington, Kentucky, and to see "PJ." Pearson went to this location and made another controlled purchase of heroin.

Birkenhauer obtained search warrants for all three locations, which were all executed the evening of May 21, 2008. At 211 West 10th Street, agents recovered $1,268 in cash, lottery tickets used to package heroin, a sifter, small plastic bags, a digital scale with cocaine residue, and four cellular phones. Only Darryl Keith Ross[1] was present when police arrived. At 906 Washington Avenue, agents recovered approximately $365 in cash, $40 of which had been used by Pearson to purchase heroin from Marc Peeples, also known as "Slim" or "Carlos," earlier in the day, ten packets of heroin wrapped in lottery tickets, small plastic bags, a cellular phone, and a scale. Defendant Shields, the lessee of the apartment, and Peeples were present when police arrived to execute the warrant. The two were interviewed at the scene. Shields said that he resided in the apartment along with his girlfriend and Peeples. "Shields stated that he only met Peeples four days ago after his friend Dave told him that he ha[d] a friend from Detroit that need[ed] a place to sell [drugs] out of. Shields said he agreed to it so he could get heroin, crack, and marijuana in return." Shields told police that he did not know Peeples's customers and that he did not sell drugs, but only used them.

_____

[1]On May 27, 2008, Birkenhauer presented a photo line up to Pearson and Pearson picked Ross out of the line up and identified him as the person he knew to be "Big Cuz" or "Frank."

At 1803 Monroe Street, agents encountered Preston Bell, also known as "PJ," and Kelly Henderson, the lessee of the home. Upon searching Bell, agents recovered one bag containing twenty-one packets of heroin packaged in lottery tickets, two bags containing crack cocaine, and a cellular phone. Agents also recovered $730 in cash, $40 of which had been used by Pearson to purchase heroin from Bell earlier in the day, and what appeared to be a ledger accounting for drugs sold. Agents questioned Bell and Henderson at the scene. Henderson said that she had been approached by a black male who offered her $50 per night in exchange for permission to sell drugs from her home. She knew this person only by the nickname "Stone." Bell stated that he had been staying at Henderson's house and selling drugs for "Stone" for approximately two weeks.

Following the May 21, 2008 events, agents began working to identify the various participants in the conspiracy. On February 17, 2009, Aaron Mears, a detective with the Covington Police Department and a full-time officer with the FBI Safe Streets Task Force, spoke with a cooperating witness who told him that "Stone's" real name was Lazelle Maxwell and that Maxwell had previously been arrested in the Detroit area. Mears located a photograph of Maxwell through a police database and eliminated all identifiers present in the photograph. In early March 2009, Mears and another agent showed the photograph to Bell and Henderson in separate interviews and asked them if they knew the person depicted in the photograph. Both persons identified the man pictured as "Stone."

Agents also re-interviewed Shields in early March 2009. During this interview, Shields contradicted the statements he had previously made to Agent Williams, stating that J.J. Pearson[2]

---

[2]According to Shields, J.J. Pearson is not the same person as the informant in this case, James William Pearson.

introduced him to Peeples approximately ten days prior to Shields's arrest. Shields stated "that he and Pearson used heroin together for many years and that Pearson approached him with the idea of letting Peeples move into his residence and sell drugs. Shields advised that he did not know any of the other persons involved in the organization other than Peeples and Pearson." He also stated that "he received $50.00 worth of heroin per day for allowing Peeples to live in his kitchen and sell heroin and crack. Shields . . . denied bringing customers to Peeples and advised that it was Pearson who brought all the customers to Peeples."

On April 9, 2009, Maxwell, Peeples, Ross, and Shields were indicted on one count of conspiracy to knowingly and intentionally distribute, and to possess with the intent to distribute, fifty grams or more of a mixture or substance containing a detectable amount of cocaine base (crack cocaine) and one count of conspiracy to knowingly and intentionally distribute, and to possess with the intent to distribute, a mixture or substance containing a detectible amount of heroin, in violation of 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 846, beginning on an unknown date and continuing through May 21, 2008. A superseding indictment issued on June 11, 2009 amended the second count to specify that the conspiracy involved 100 grams or more of heroin and added two forfeiture counts.

Shields initially pleaded not guilty, but on July 27, 2009, he pleaded guilty to the crack-cocaine conspiracy count, in exchange for the government's agreement to dismiss the heroin conspiracy count at sentencing. Maxwell pleaded not guilty, filed a pre-trial motion to suppress Bell's and Henderson's pre-trial identifications of him as "Stone," which the district court denied, and proceeded to trial.

Maxwell's trial began on September 16, 2009 and spanned six days. A number of persons allegedly involved in the conspiracy, as well as law-enforcement personnel involved in investigating the conspiracy, were called by the government. Lerin Dixon testified that Maxwell went by the names "Stone" and "Mook." She said that she met Maxwell and Ross through some friends in mid-March 2008. Starting from April 1, 2008, Dixon drove Ross and Maxwell around, taking them to Henderson's house at 1803 Monroe Street at least five times a week to bring "drugs to the workers . . . and to get the money from them for what they'[d] already sold" and to Detroit to "re-up" or to obtain more crack cocaine and heroin. Dixon explained how Ross and Maxwell prepared the drugs for sale after obtaining them from Detroit, testifying that heroin was packaged in lottery tickets and crack cocaine was just taken "to the workers at [Henderson's] house." Dixon identified Bell as the "dope boy" who sold drugs for Ross and Maxwell at Henderson's house. She estimated that he sold between $600 and $1,000 worth of drugs a day from this residence.

Kimberly McIntosh, Henderson's cousin, identified Maxwell as the man she knew as "Stone." She stated that she first met "Stone" in March or April 2007. She testified that Dixon and "Stone" picked her up one day and "Stone" asked her to purchase a cellular phone for him; McIntosh did buy "Stone" a phone, putting it in her own name.[3]

Pearson testified that prior to May 21, 2008, he obtained heroin by calling "Stone" and "Big Cuz" or "Frank," who would either sell him heroin directly or send him to 1803 Monroe Street or 906 Washington Avenue so that he could purchase heroin from "PJ" or from "Slim" or "Carlos." Pearson testified that he dealt with "Stone" and "Frank" a total of thirty to forty times and he

---

[3]Paula Papke, a security analyst for Cincinnati Bell, testified that one of the numbers assigned to the name "Stone" in most of the cellular phones recovered at the three locations was associated with an account paid for by McIntosh.

identified Maxwell as "Stone." He stated that the house where he would deal with "PJ" was owned by a woman named Kelly (Henderson) and the Washington Avenue apartment was rented by Shields. Pearson also testified that the heroin sold at both locations was packaged in lottery tickets and that "Stone" or "Frank" would provide more drugs to "PJ" when his supplies ran low.

Sergeant Birkenhauer testified that when he looked through the numbers in the various cellular phones found at the three locations, the numbers for "Frank," "Stone," "Cuz," "Carlos," "Slim," Kelly (Henderson), Lerin (Dixon), and "PJ" matched up across the phones. The cellular phones belonging to Peeples and Ross showed calls coming in from Pearson at the time of the two controlled drug buys.

Henderson testified that she was a crack-cocaine and heroin user and that she met "Stone" through her previous drug dealer in January 2008. "Stone" stayed at her house and sold crack cocaine; he gave Henderson $50 in crack cocaine every day he stayed at her house. In March or April 2008, "Stone" began selling heroin—packaged in lottery tickets—from the home. "Stone" placed Bell at Henderson's house to sell drugs in approximately March 2008. After "Stone" left Henderson's house, he continued to come over to re-supply Bell with drugs and to collect money from Bell. Henderson testified that she believed "Frank" to be "Stone's" partner, and said that she saw Dixon driving both men to drop off drugs and to collect money from the house. Henderson identified Maxwell as "Stone."

Bell testified that he came to Northern Kentucky in March or April 2008 after one of his friends called him and invited him to come to the area and work as a dope boy for a man named "Stone." He identified Maxwell as "Stone." After Bell arrived in Cincinnati via a Greyhound bus, "Stone" took him to Henderson's house, "told [Bell that] this [was] where [Bell] was going to be

-7-

working . . . , and gave [Bell] some dope." Bell packaged heroin in lottery tickets and sold approximately fifty to sixty packets of heroin, and six or seven grams of crack cocaine, a day. "Stone" paid Bell approximately $500-$700 a week for selling drugs. The proceeds of the drug sales were "collected every day."

According to Bell, he received drugs to sell every day. He testified that he kept a ledger to keep track of the drugs he was given, the money he received for selling drugs, and the money he gave Dixon. Bell also wrote out receipts for Dixon so that he would have proof of the amounts he had given her if he was questioned by "Stone." The ledger and the receipts were found at Henderson's house on May 21, 2008. Bell also testified that he traveled home to Detroit approximately two times after arriving in the Northern Kentucky area. The first time, "Stone" had asked him to bring back some crack cocaine. The second time, Bell went to pick up Peeples, his cousin, because "Stone" and "Frank" wanted Bell to find another person to work for them. Bell testified that Peeples went to live in, and sold crack cocaine and heroin from, an apartment in Newport, Kentucky. Bell saw "Frank" only a few times, but he saw "Stone" about two or three times a week during the seven-week period Bell was selling drugs in Northern Kentucky.

Peeples testified that he came to the Northern Kentucky area with Bell, his cousin, in May 2008. On the day of his arrival, he met "Stone" and "Frank." "Stone" told Peeples that he would be paid $500 a week for selling drugs from an apartment in Newport. Peeples met Shields his first night at the apartment. Peeples was given approximately ten packets of heroin packaged in lottery tickets and ten bags of crack cocaine. "Stone" gave Peeples a cellular phone the following day. Peeples testified that Shields brought customers to him, and that in exchange for housing Peeples and bringing customers to him, Shields received $40-50 in drugs every day or every other day.

-8-

When Peeples ran out of drugs, he would call "Stone" and more drugs would be delivered to the residence. "Stone" personally delivered heroin to the apartment only once. Peeples testified that he was at Shields's apartment for approximately ten days before he was arrested on May 21, 2008, and that he was re-supplied with drugs approximately three or four times. Peeples identified Maxwell as "Stone."

Ross testified that Maxwell's nicknames were "Stone" and "Mookie." He first met Maxwell around 1988 or 1989. In early December 2007, Maxwell contacted Ross and told him that he had found a place where he thought Ross "could make a few dollars . . . . [s]elling drugs." Shortly thereafter, Ross went "to Northern Kentucky [to] be a part of [Maxwell's] business." At the time, "Stone was working in [Kelly's] house by hi[m]self," selling heroin packaged in lottery tickets. Ross testified that Dixon "was the driver that always [went] by the houses and drop[ped] the dope off and pick[ed] the money up," that Bell got involved in the business after Dixon, and that Bell sold crack cocaine and heroin out of "Kelly's house." According to Ross, "drugs [were] being re-upped at Kelly Henderson's house . . . . [e]very day and a half, sometimes every three days." Ross stated that he first met Peeples in April 2008, and that Peeples stayed at an apartment in Newport and sold drugs there. Ross testified that he and Maxwell went to Detroit with Dixon approximately once or twice a week to purchase additional drugs for their operation. According to Ross, Bell sold approximately $400-500 worth of crack cocaine and $800-$2,000 worth of heroin a day from Henderson's house. Ross testified that approximately fifteen ounces of crack cocaine and fifteen to twenty ounces of heroin were involved in the operation from its inception until May 21, 2008.[4]

---

[4]Fifteen ounces is 425.242 grams. Twenty ounces is 566.990 grams.

Shields and several of Maxwell's family members testified on Maxwell's behalf at trial. Shields denied knowing, or having ever seen, Maxwell. He testified that he was asked by J.J. Pearson if Peeples could stay at his home and sell drugs. Shields agreed, and Peeples sold drugs out of Shields's apartment for four days before his arrest on May 21, 2008. Shields testified that Peeples sold only heroin, and that Shields received heroin packaged in lottery tickets every two days in exchange for housing Peeples. Shields testified that he did not know who brought Peeples to his house, and that he was at work for much of the day and did not observe most of the drug sales that took place. Shields's testimony contradicted the facts stated in his plea agreement. He testified that the plea agreement he signed was inaccurate and contained falsehoods.

Maxwell's family members, including his former wife, adoptive mother, cousins, and sister, testified that Maxwell's nickname was "Mookie," not "Stone," that he stayed with family members in Akron, Ohio and Detroit periodically from December 2007 until May 2008, that he helped his former wife and his sister with their business ventures during this time period, that he was not observed carrying a lot of cash, and that he interacted with Ross infrequently.

The jury found Maxwell guilty on both conspiracy counts. Maxwell filed a pro se motion for a new trial based on newly discovered evidence, which was denied at sentencing. The district court sentenced Maxwell to 360 months' imprisonment.

With respect to Shields, the district court notified the parties that it would "consider at the time of sentencing a possible adjustment to [Shields's] guideline range for obstruction of justice under § 3C1.1" based on possible false testimony given by Shields during Maxwell's trial. The district court also asked the parties to address "whether a finding of false testimony would . . . affect the downward adjustment for acceptance of responsibility under U.S.S.G § 3E1.1." At Shields's

-10-

sentencing hearing, the district court imposed a two-level sentence enhancement for obstructive conduct under § 3C1.1, and declined to apply an offense-level reduction for acceptance of responsibility. Shields's resulting guideline range was 120 to 121 months, due to the mandatory-minimum, but the district court concluded that an upward variance was in order and sentenced Shields to 133 months' imprisonment.

## II.

### A.

Shields first argues that the district court erred in applying a two-level enhancement pursuant to United States Sentencing Guidelines § 3C1.1 to Shields's sentence. A district judge's decision to impose such an enhancement is reviewed via a three-step process. *United States v. Chance*, 306 F.3d 356, 389 (6th Cir. 2002). First, we review "the district court's finding of facts underlying the enhancement for clear error." *Id.* (citing *United States v. Middleton*, 246 F.3d 825, 846 (6th Cir. 2001)). Next, we review de novo "the district court's conclusion that a given set of facts constitutes obstruction of justice." *Id.* Finally, "once the district court has determined that the defendant has obstructed justice, the application of the two level enhancement is mandatory," and we review the enhancement de novo. *Id.*

Section 3C1.1 provides for a two-level increase in offense level if a defendant willfully obstructs or impedes the administration of justice with respect to the investigation, prosecution, or sentencing of the offense of conviction, and the obstructive conduct relates "to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense." Application Note 4 states that the two-level enhancement applies where an individual commits, suborns, or attempts to suborn perjury, "including during the course of a civil proceeding if such perjury pertains to

-11-

conduct that forms the basis of the offense of conviction," or where an individual provides "materially false information to a judge or magistrate judge." Application Note 2 cautions, however, that "not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice."

Application Note 5 also states that "making false statements, not under oath, to law enforcement officers" does not ordinarily "warrant application of this adjustment, but may warrant a greater sentence within the otherwise applicable guideline range or affect the determination of whether other guideline adjustments apply . . . ." However, the two-level enhancement still applies pursuant to Application Note 4 if the individual provides "a materially false statement to a law enforcement officer that significantly obstruct[s] or impede[s] the official investigation or prosecution of the instant offense."

To impose an obstruction-of-justice enhancement based on perjury, the district court must (1) identify the particular portions of the defendant's testimony it considers to be perjurious; and (2) make specific findings as to each element of perjury or make a finding that encompasses all of the factual predicates for a finding of perjury. *Chance*, 306 F.3d at 390. A district court's "finding of perjury [is] sufficient where it state[s] that '*the defendant was untruthful at trial with respect to material matters* in this case' and that the untruthful testimony on material matters '*was designed to substantially affect the outcome of the case.*'" *Id.* (citations omitted) (emphasis in original).

In this case, Shields was called as a witness by Maxwell, not by the government. Shields's testimony at trial regarding the types of drugs Peeples sold while staying at his apartment, and his own role in the sales, was inconsistent with the facts he had admitted at re-arraignment and in his plea agreement. Specifically, Shields stated at trial that Peeples sold only heroin, not both crack

cocaine and heroin, out of Shields's home, and that Shields did not steer customers to Peeples, although he had earlier admitted doing so. Significantly, Shields had only pleaded guilty to the crack cocaine conspiracy count. Additionally, Shields's testimony at trial concerning the length of time Peeples had stayed at his house was inconsistent with the information Shields had provided law-enforcement officers on March 9, 2009. In particular, Shields testified that Peeples was only at his home for four days, not eight to ten days. At sentencing, Shields argued that he did not intentionally or willfully lie at trial; rather, he testified consistently with what he told agents in an interview conducted when he was first arrested.

The district court clearly identified the particular portions of Shields's testimony that it considered to be perjurious and specifically found that Shields was untruthful with respect to material matters in this case and that his testimony was designed to substantially affect the outcome of the case. It discussed Shields's testimony regarding the length of time Peeples was at his home and the type of drugs Peeples was selling and noted that, at trial, Shields "denied that he acknowledged the information contained in the plea agreement," and denied providing certain information "when [he was] questioned about [the] March 9 interview." The district court found that Shields's testimony was false and was "inconsistent with what [it] believe[d] was truthful testimony offered by [] Peeples as to the length of time that he was present at [] Shields'[s] home. . . .[and] with respect to his drug distribution activities." The court found that Shields's false testimony was material because "if the jury had credited []Shields with being truthful, it would have certainly undercut the witnesses offered by the United States and may have resulted in an acquittal of [] Maxwell . . . ." As a result, the district court applied a two-level obstruction-of-justice enhancement.

Shields's argument on appeal that the obstruction-of-justice enhancement should not apply fails. First, the court did not clearly err in finding that Shields did not merely forget what occurred in the days leading up to May 21, 2008. Shields told different stories on four separate occasions. Further, Shields not only made a false statement to law-enforcement officers regarding the amount of time Peeples had stayed at his apartment, but also his statement significantly obstructed or impeded the official investigation or prosecution of the offense because it contradicted the information provided by other witnesses, including Peeples. Shields also admitted at trial that he provided materially false information to a federal judge at the re-arraignment (or plea) hearing. As a result, the district court did not err in imposing a two-level sentence enhancement for obstruction of justice.[5]

**B.**

Next, Shields argues that the district court erred in denying Shields an offense-level reduction for acceptance of responsibility under United States Sentencing Guidelines § 3E1.1. We employ a clear-error standard in reviewing such a denial when the denial is based on "purely factual" determinations. *See United States v. Bolden*, 479 F.3d 455, 464 (6th Cir. 2007).

Section 3E1.1 provides that a defendant's offense level shall be decreased by two levels if he "clearly demonstrates acceptance of responsibility for his offense." Application Note 3 states that "[e]ntry of a plea of guilty prior to the commencement of trial combined with truthfully admitting the conduct comprising the offense of conviction . . . will constitute significant evidence of

_____

[5]At this juncture, one might question whether the enhancement should apply at all when the testimony is given at a co-defendant's trial after the testifying defendant has already pleaded guilty. This question was addressed in *United States v. Walker*, 119 F.3d 403, 406-07 (6th Cir. 1997), and Shields does not make this argument on appeal.

acceptance of responsibility . . . . However, this evidence may be outweighed by conduct of the defendant that is inconsistent with such acceptance of responsibility." *See also United States v. Mahaffey*, 53 F.3d 128, 134 (6th Cir. 1995) ("[A] guilty plea does not entitle a defendant to a sentence reduction as a matter of right."). Additionally, Application Note 4 states that "[c]onduct resulting in an enhancement under § 3C1.1 . . . ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct."

At Shields's sentencing hearing, the district court declined to apply an offense-level reduction for acceptance of responsibility because Shields's testimony had "been inconsistent, and if the Court [took] him at his word in his trial testimony, he would not demonstrate full and complete responsibility for his actions that he acknowledged at the time his plea was entered with respect to distribution of both crack cocaine as well as heroin." Shields does not provide any substantive argument on appeal regarding why the district court erred in denying his request for an offense-level reduction for acceptance of responsibility. Based on Shields's inconsistent testimony, his statements at trial that the facts contained in his plea agreement were false, and the district court's finding that Shields obstructed justice, the district court did not abuse its discretion in denying Shields an offense-level reduction based on acceptance of responsibility.

### C.

Finally, Shields claims that his mandatory minimum sentence for conspiracy to distribute fifty grams or more of cocaine base violates his constitutional right to equal protection. We review de novo "[a] constitutional challenge to a sentence." *United States v. Jones*, 569 F.3d 569, 573 (6th Cir. 2009) (citations omitted). Shields admits that he did not present this argument below. Therefore plain-error review applies. Even under de novo review, Shields's argument does not

succeed. In *Kimbrough v. United States*, 552 U.S. 85, 108 (2007), the Supreme Court held that, with respect to crack-cocaine sentences, the district courts "are constrained by the mandatory minimums Congress prescribed in the 1986 Act." Further, we have repeatedly rejected the argument that "§ 841 violates [a defendant's] right to the equal protection of the law under the Fifth Amendment . . . ." *United States v. Wimbley*, 553 F.3d 455, 463 (6th Cir. 2009). Thus, Shields's argument is without merit.[6]

### III.

### A.

Maxwell contends that Bell's and Henderson's pre-trial photo identifications of Maxwell were unduly suggestive and unreliable and should have been suppressed, and that the subsequent in-court identifications of Maxwell were equally infirm and should not have been permitted. We review a district court's decision on a motion to suppress under two standards. We review findings of fact for clear error and conclusions of law de novo. *United States v. Master*, 614 F.3d 236, 238 (6th Cir. 2010). We view "the evidence in the light most likely to support the district court's decision." *United States v. McPhearson*, 469 F.3d 518, 523 (6th Cir. 2006) (citation and quotation omitted). "A factual finding is clearly erroneous when, although there may be evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Blair*, 524 F.3d 740, 747 (6th Cir. 2008) (citation and quotation omitted).

---

[6]Shields does not challenge the district court's imposition of a twelve-month upward variance, but this variance would be supported by the district court's reasoning regarding Shields's conduct, criminal history, and characteristics.

"[C]onvictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Cornwell v. Bradshaw*, 559 F.3d 398, 413 (6th Cir. 2009) (citing *Simmons v. United States*, 390 U.S. 377, 384 (1968)). The Supreme Court has held that in cases involving an identification based on the examination of a single photograph, a trial court should adhere to the factors articulated in *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972), to determine whether the identification has indicia of reliability such that there is no substantial likelihood of irreparable misidentification. *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977). These factors are the witness's opportunity "to view the criminal at the time of the crime, the witness'[s] degree of attention, the accuracy of the witness'[s] prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Neil*, 409 U.S. at 199. The essential question is "whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." *United States v. Causey*, 834 F.2d 1277, 1284-85 (6th Cir. 1987) (citations and internal quotations omitted).

At the suppression hearing, Officer Mears testified that he and another officer showed Bell a photograph of Maxwell on March 9, 2009 and simply asked him "Do you know who this is?" Bell immediately replied "That's Stone." The next day, Mears and another officer met with Henderson, "sat down, put the picture in front of her, [and asked] 'Do you know who this is?'" Henderson too replied, without hesitation, "That's Stone."

Bell testified that he met "Stone" in April 2008 and saw him several times a week until his arrest on May 21, 2008. Some of these meetings were brief, while others lasted several hours.

-17-

According to Bell, there was nothing that obstructed or limited his ability to see what "Stone" looked like. Henderson testified that she first met the man calling himself "Stone" sometime between January and March 2008, and that she saw him over 100 times prior to her arrest. Although Henderson saw "Stone" only briefly on several of these occasions, many of their other meetings were more lengthy, and "Stone" even spent the night at Henderson's house several times. Henderson testified that nothing obstructed her ability to see what "Stone" looked like on any of these occasions. Bell and Henderson's testimony regarding the procedure of their pre-trial identification of "Stone" was consistent with that of Mears.

At the conclusion of the hearing, the district court outlined the five factors set out in *Neil* and found that both Bell and Henderson saw Maxwell or "Stone" numerous times prior to being shown the photograph and nothing prevented them from seeing what he looked like, their previously-provided descriptions of "Stone" matched Maxwell, they were both certain that the person in the photograph shown to them was the person known to them as "Stone," and the "length of time between the criminal activity charged in the indictment and [Bell and Henderson's] [viewing of the photograph] . . . [was] still of a length that would be sufficient [to ensure that] their memories [had] not fade[d]." Thus, the district court concluded that "the identification was not so unduly suggestive as to constitute a violation of due process," and denied Maxwell's motion to suppress. The court's findings and analysis are sound and we find no error in either.

Although Bell and Henderson identified Maxwell approximately ten months after the crimes occurred, courts have upheld similar periods of delay. *See Causey*, 834 F.2d at 1286. Since Bell and Henderson had ample opportunity to observe Maxwell over the course of several months, there was little danger that their memory of him would fade in less than a year, as would be expected of

witnesses who saw a defendant only once or twice.  Finally, as in *Causey*, there was "clear and convincing evidence that [Bell and Henderson's] in-court identification [of Maxwel] had an origin independent of the single photo showing." *Id.* at 1285.  The district court therefore did not err in denying Maxwell's motion to suppress and in allowing Bell and Henderson to identify Maxwell in court.

**B.**

Maxwell also argues that there was insufficient evidence for any reasonable jury to convict him.  In reviewing the sufficiency of the evidence to support a criminal conviction, the critical inquiry is "whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318 (1979).  This inquiry requires us to "review the evidence 'in the light most favorable to the prosecution' and determine whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Boring*, 557 F.3d 707, 711 (6th Cir. 2009) (citing *Jackson*, 443 U.S. at 319)).  "A defendant claiming insufficiency of the evidence bears a very heavy burden." *United States v. White*, 492 F.3d 380, 393 (6th Cir. 2007) (citations and internal quotations omitted).

"To sustain a conviction for conspiracy under 21 U.S.C. § 846, the government must have proved:  (1) an agreement to violate drug laws, in this case 21 U.S.C. § 841; (2) knowledge and intent to join the conspiracy; and (3) participation in the conspiracy." *United States v. Deitz*, 577 F.3d 672, 677 (6th Cir.  2009) (citation and quotation omitted).  "[P]roof of a formal agreement is not necessary; a tacit or material understanding among the parties will suffice." *United States v. Warman*, 578 F.3d 320, 332 (6th Cir. 2009) (citations and internal quotations omitted).  "The existence of a conspiracy may be inferred from circumstantial evidence that can reasonably be

interpreted as participation in the common plan." *Id.* (citations and internal quotations omitted). Further, "[t]estimony by co-conspirators alone can be sufficient to prove the existence of a conspiracy." *United States v. Copeland*, 321 F.3d 582, 600 (6th Cir. 2003) (citing *United States v. Meyer*, 803 F.2d 246, 248 (6th Cir. 1986)).

In this case, eight witnesses, several of whom were Maxwell's alleged co-conspirators, identified Maxwell as the leader of a conspiracy to distribute large quantities of crack cocaine and heroin in the Northern Kentucky area. Additionally, cellular phones seized from the three locations tied to the drug sales were linked via programmed numbers to the phone number assigned to Maxwell. McIntosh, the registered owner of the cellular phone with Maxwell's assigned number, testified that she obtained this phone for Maxwell at his request. This phone number either received or made calls to Maxwell's sister on nine occasions in May 2008. Additionally, Ross, the alleged co-leader of the conspiracy along with Maxwell, testified that the co-conspirators sold approximately fifteen ounces of crack cocaine and fifteen to twenty ounces of heroin in Northern Kentucky. In light of the overwhelming evidence demonstrating Maxwell's involvement in the conspiracy, Maxwell does not meet the heavy burden of proving that the evidence was insufficient to support his conviction.

## C.

Finally, Maxwell contends that his sentence was substantively unreasonable because (1) the district court did not give sufficient weight to the nature and circumstances of the offense and to Maxwell's history and characteristics; (2) a lesser sentence would provide just punishment for the offense; (3) Maxwell's sentence created an unwarranted disparity as it exceeded that of Ross; and (4) the district court did not consider the sentencing disparity between crack and powder cocaine.

When reviewing a sentence, we review the district court's factual findings for clear error. *United States v. Coleman*, 627 F.3d 205, 211 (6th Cir. 2010) (citations omitted). Whether the facts found warrant the application of a particular guideline provision is a legal question we review de novo. *Id.* (citations omitted).

We review sentences for both procedural and substantive unreasonableness. *United States v. Bowers*, 615 F.3d 715, 725 (6th Cir. 2010). Procedural unreasonableness includes "selecting a sentence based on clearly erroneous facts . . . ." *Id.* (quoting *Gall v. United States*, 552 U.S. 38, 51 (2007)). Substantive unreasonableness is present where, taking into account the totality of the circumstances, the factors found in § 3553(a), on the whole, do not justify the sentence imposed. *Id.* (citing *Gall*, 552 U.S. at 51). "A sentence will be deemed substantively unreasonable if the court 'select[ed] the sentence arbitrarily, bas[ed] the sentence on impermissible factors, fail[ed] to consider pertinent § 3553(a) factors or [gave] an unreasonable amount of weight to any pertinent factor.'" *United States v. Ruvalcaba*, 627 F.3d 218, 225 (6th Cir. 2010) (citing *United States v. Collington*, 461 F.3d 805, 808 (6th Cir. 2006)) (citations omitted). In this circuit, we apply a rebuttable appellate presumption of substantive reasonableness to a sentence that falls within a properly calculated guidelines range. *Id.*[7]

Maxwell's argument that his sentence is substantively unreasonable because the district court did not consider certain aspects of his history is unavailing. The district court was not required to address explicitly each fact in Maxwell's past because "all of these circumstances were included in the PSR and the district court stated that it had read and considered that report." *United States v.*

_____

[7]Maxwell's properly calculated guidelines range is 360 months to life. The district court sentenced Maxwell to 360 months' imprisonment. Because this sentence falls within the applicable guidelines range, and indeed was at the lowest end of the range, it is presumed to be reasonable.

*Wittingen*, 519 F.3d 633, 639 (6th Cir. 2008). The district court did consider Maxwell's "serious criminal history." Further, Maxwell's argument regarding the nature of the offense—that the amount of drugs involved in the offense was overstated—is undercut by his alleged co-conspirators' testimony at trial and by the jury's verdict. Similarly, Maxwell's argument that his sentence should have been lower because the crime was victimless and not violent fails because the district court considered that no firearm had been used in the offense, and because, in light of the seriousness of the offense and the likelihood that Maxwell would re-offend, Maxwell has not shown that "a different sentence was required." *See United States v. Brown*, 579 F.3d 672, 687 (6th Cir. 2009).

Maxwell also fails to demonstrate that his sentence would create unwarranted disparities between Maxwell and his alleged co-conspirators, particularly Ross. Although § 3553(a)(6) requires a sentencing judge to consider "the need to avoid unwarranted sentence disparities," "this factor concerns *national* disparities between defendants with similar criminal histories convicted of similar criminal conduct—not disparities between codefendants.'" *United States v. Carson*, 560 F.3d 566, 586 (6th Cir. 2009) (citations omitted). Additionally, "a number of factors might result in legitimate codefendant disparities, including differences in criminal histories, the offenses of conviction, or one coconspirator's decision to plead guilty and cooperate with the government." *Id.* (citations and internal quotations omitted). In this case, all of Maxwell's alleged co-conspirators cooperated with the government and did not proceed to trial. Many of them, including Ross, also testified against Maxwell at trial. Thus, any disparity between Maxwell's sentence and those of his co-conspirators was justified and not unwarranted.

Finally, Maxwell argues that the district court failed to consider the sentencing disparity between crack and powder cocaine. Maxwell did not explicitly raise this argument prior to or at

sentencing. Additionally, the district court stated several times that the guidelines are advisory, and in no way suggested that it lacked discretion to depart from them. "[W]hen a district court observes that the Guidelines are advisory and provides no indication that policy disagreements are not a proper basis to vary[, particularly in the context of the crack cocaine Guidelines,] then a sentence within the Guidelines range remains presumptively reasonable on appeal." *United States v. Simmons*, 587 F.3d 348, 364 (6th Cir. 2009).

## IV.

We **AFFIRM** Shields's conviction and sentence and Maxwell's conviction and sentence.